**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SRAM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 C 03629 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| HAYES BICYCLE GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff SRAM, LLC seeks to recover damages stemming from Defendant Hayes Bicycle Group, Inc.'s purported infringement of one of SRAM's patents, numbered 6,217,049 B1 ('049 Patent). R. 50, Second Am. Compl.[1] SRAM moves for partial summary judgment on the issue of whether Hayes is bound by the Settlement and License Agreement (call it the "Settlement Agreement" for convenience) executed by SRAM and another company, Answer Products, Inc., whose obligations SRAM believes Hayes has taken on. R. 63, Pl.'s Mot. Partial Summ. J. On the other side of the same coin, Hayes moves to dismiss Count 1 of SRAM's complaint, which seeks to enforce the Settlement Agreement against Hayes. R. 68, Def.'s Mot. Dismiss. For the reasons discussed below, the Court concludes that Hayes is bound, as a matter of law, by the terms of the Settlement Agreement, and grants SRAM's motion for partial summary judgment. The Court also concludes that SRAM has set forth sufficient facts in its

---

[1]The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action involves the determination of the infringement of a United States Patent.

complaint to state a claim, and, consequently, denies Hayes's Motion to Dismiss Count 1 of the Second Amended Complaint.

**I.**

In deciding SRAM's motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In deciding Hayes' Motion to Dismiss, the Court accepts the complaint's factual allegations as true and draws reasonable inferences in SRAM's favor. *Ashcroft v. al–Kidd*, —— U.S. ——, 131 S. Ct. 2074, 2079 (2011). Although the parties disagree on many of the specific details, the following facts are limited to those necessary to deciding these motions, and are not in dispute (except as specifically noted).

In 2003, SRAM[2] sued Answer over Answer's alleged infringement of two patents held by SRAM: Patent Nos. 5,934,697 ('697 Patent) and the '049 Patent. R. 74, Ex. 1, Complaint. Before any formal discovery took place, however, SRAM and Answer entered into the Settlement Agreement and filed a stipulation of dismissal. R. 74, Ex. 4, Settlement and License Agreement; R. 74, Ex. 5, Notice of Filing of Stipulation of

---

[2]As Hayes points out, "SRAM Corporation," the party referenced in the 2003 lawsuit and the Settlement Agreement, bears a different name to the party involved in the present litigation, "SRAM, LLC." *See* R. 80, Memorandum in Opposition to SRAM's Motion for Partial Summary Judgment (hereinafter Opp'n Mem.) at 13. The Declaration of Michael J. Hickey, submitted by SRAM in support of its Motion for Partial Summary Judgment, establishes that SRAM, LLC is the successor-in-interest to SRAM Corporation. R. 65-1, Hickey Decl. ¶ 3; Hickey Decl. Ex. A at 1; Hickey Decl. Ex. F at 3; Hickey Decl. Ex. G at 2, 3. Because there is no legal significance to SRAM's name change, and because SRAM Corporation's assignment of the '049 Patent to SRAM, LLC is a matter of public record, *see* Fed. R. Evid. 201(b)(2); *Denius v. Dunlap*, 330 F.3d 919, 926-27 (7th Cir. 2003), the Court will refer to both SRAM Corporation and SRAM, LLC as "SRAM" for the sake of simplicity.

Dismissal. Among the terms of the Settlement Agreement were that Answer could not challenge the validity of the '049 Patent, and that Answer would pay SRAM royalties on the sale of any '049 Patent-infringing products. Settlement Agreement §§ 7.1, 7.4. The extent to which Answer was prohibited from challenging the patents is disputed by the parties. *See infra* Part III.A.5.

Soon thereafter, Answer entered into a Loan and Security Agreement with a financing company called Guaranty Business. In that agreement, Answer pledged, as collateral, a collection of its assets related to the design and production of suspension forks and their components for use in bicycles. R. 65-1, Ex. I, Secured Party Asset Purchase Agreement. Answer defaulted on this loan, and voluntarily surrendered the collateral to Guaranty as part of a transaction whereby Guaranty sold those same assets to HB Bicycle Components, LLC. R. 74, Ex. 7, Settlement and Voluntary Surrender Agreement. At the time of this sale, HB Bicycle's sole member was Defendant Hayes. R. 65, Pl.'s Statement of Facts (Pl.'s SOF) ¶ 20. Around six days after this acquisition, HB Bicycle changed its name to HB Suspension Products, LLC (there is no legal significance to HB's name change, so both HB Bicycle and HB Suspension will be referred to as "HB" throughout this opinion). Pl.'s SOF ¶ 27. In 2007, HB paid SRAM some royalty payments on the sale of products that potentially infringed the '049 Patent, pursuant to the terms of the Settlement Agreement. R. 96-1, Ex. J, Campbell Dep. at 96:7-97:15. HB later transferred all of its assets to its sole member, Defendant Hayes, on January 1, 2009. Pl.'s SOF ¶¶ 28-29.

In 2012, SRAM sued Hayes, alleging both that Hayes has sold products that infringe the '049 Patent and that Hayes has not paid royalties on these products since 2007, in violation of the Settlement Agreement. Second Am. Compl. SRAM has moved for partial summary judgment on the issue of whether Hayes is bound by the terms of the Settlement Agreement, and conversely, Hayes has moved to dismiss SRAM's claim that Hayes is bound by the Settlement Agreement.

## II.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only competent evidence of a type otherwise admissible at trial, *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse

party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

In evaluating a motion to dismiss, the Court must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *al-Kidd*, 131 S. Ct. at 2079. Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555–56); *McGowan v. Hulick*, 612 F.3d 636, 638 (7th Cir. 2010). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the

5

speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III.

#### A. SRAM's Motion for Partial Summary Judgment

SRAM's motion boils down to one question: has Section 8.5 of the Settlement Agreement—the assignment provision of the agreement—been satisfied so as to validly transfer the Settlement Agreement's rights, and their accompanying obligations, to Hayes? To answer this question, the Court will examine the Settlement Agreement between SRAM and Answer, as well as the agreements passing the property from Answer to Guaranty to HB. These agreements are governed either by Illinois or by California law.

Illinois follows the "four corners" rule of contract interpretation. Under this common-law rule of contract interpretation, "a court initially looks to the language of a contract alone. If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999) (citations omitted). But if "the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present." *Id.* Only where an ambiguity is present may extrinsic evidence be admitted to aid the trier of fact. *Id.* California law is somewhat more permissive with respect to extrinsic evidence: so long as the evidence "is relevant to prove a meaning to which the language of the

6

instrument is reasonably susceptible," it should be admitted by the court, even if the meaning of a written instrument is "plain and unambiguous on its face." *Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) (considering and rejecting the four corners rule). The determination of whether a written contract is ambiguous under California law is, nevertheless, a question of law that must be decided by the court. *Brant v. Cal. Dairies, Inc.*, 48 P.2d 13, 16 (Cal. 1935)*; Gardiner v. Gaither*, 329 P.2d 22, 27 (Cal. Dist. Ct. App. 1958)*ifornia*.

### 1. The Settlement Agreement

By its terms, the Settlement Agreement is governed by Illinois law. Settlement Agreement § 8.2. As explained below, because the assignment provision of the Settlement Agreement is unambiguous, no extrinsic evidence will be considered in interpreting that provision. *Air Safety*, 706 N.E.2d at 884. In full, the assignment provision, Section 8.5, reads:

> The license and covenant not to sue granted in this Agreement is personal to Answer and shall not be assigned or transferred, in whole or in part, by Answer or by operation of law without the *prior written consent* of SRAM; provided, however, that Answer may transfer or assign its rights under this Agreement in connection with the *merger, sale or transfer* of all or substantially all of (i) its stock or (ii) its assets related to its design or production of suspension forks and their components for use in bicycles.

Settlement Agreement § 8.5 (emphases added). This section reads like a general rule (SRAM's consent is needed for an assignment) with an exception (Answer may assign its rights in connection with an all-stock or all-asset transfer). One part of Hayes's brief seems to accept that interpretation, but another part of the brief describes the

7

assignment provision as requiring two *conditions* on transfers. For example, Hayes argues at one point that "SRAM imposed two conditions before the personal license could be transferred to a third party:" First, *"prior written consent of SRAM* is required before the [Settlement] Agreement can be assigned or transferred by Answer or by operation of law"; second, *"Answer*, not the other party, *may* transfer or assign its rights under this Agreement in connection with the merger, sale or transfer of all or substantially all of its stock or its assets." R. 73, Mem. Support Hayes's Mot. Dismiss at 5. Earlier in its same brief, however, Hayes appears to contradict this, stating that "[o]nly in the event of a merger, sale, or transfer of all or substantially all of Answer's stock or assets is Answer permitted to assign or transfer the [Settlement] Agreement without SRAM's written consent." *Id.* That construction—the general rule of consent unless there is an all-stock or all-asset transfer—is the only reasonable way to read the plain language. Section 8.5 does not require that SRAM must give written consent *and* Answer must transfer substantially all of its stocks or suspension-fork assets before Answer's rights may be transferred or assigned.[3] Rather, Section 8.5's use of a semicolon and the phrase "provided, however, that" means that these two terms function in the alternative: *either* Answer may assign the license and covenant not to sue with SRAM's written consent (even if that transfer is unaccompanied by other assets), *or* Answer may assign "its rights under this Agreement" so long as that

---

[3]Because consent is not needed for an assignment where there is an all-asset transfer, the letter that Hayes supplemented into the record, R. 140, does not impact this decision, which is based on the transfer, not consent.

8

transfer is accompanied by substantially all of its stock or suspension-fork assets (even if SRAM does not consent to that transfer). Settlement Agreement § 8.5. No evidence in the record suggests that SRAM has given its written consent. So the issue is whether Answer has validly transferred its rights along with substantially all of its stock or pertinent assets.

Looking more closely at this part of Section 8.5, there are three conditions that must be satisfied in order to effectuate a transfer of the Agreement's rights without SRAM's written consent: (1) The transfer must be made by Answer or its assignee ("*Answer* may . . ."); (2) the transfer must be made in connection with a merger, sale, or transfer; and (3) that merger, sale, or transfer must include substantially all of Answer's stock or suspension fork-related assets. *Id.* (emphasis added). First, because the provision notes that Answer may transfer or assign its rights, an asset transfer effectuated by theft would not fulfill this condition; were the license somehow to come into the possession of another party without Answer's consent, involvement, or knowledge, then *Answer* would not have transferred the license. A closer question is whether a transfer effectuated by court order, say, through bankruptcy, could satisfy Section 8.5. The phrase "Answer may" implies that the transfer must spring from Answer rather than some other agent, and it implies some agency in the decision on Answer's part.[4] Second, Answer may only transfer its rights under the Agreement in

---

[4] The Court accepts, to a limited extent, the construction of "Answer may" proposed by Hayes: this provision "is permissive rather than mandatory" and Answer may therefore choose not to transfer its rights and obligations under the Settlement Agreement along with the rest of its assets. Mem. Support Hayes's Mot. Dismiss at 5 n.5. But that language does not purport

9

connection with a merger, sale, or some other transfer. This condition is broad and self-evident, as it only requires Answer's transfer to have some "connection with" whatever "merger, sale, or transfer" is being undertaken. *Id*. Finally, the transfer provision requires that the rights under the Agreement be passed along with substantially all of either Answer's stock or its suspension fork-related assets. This condition is likewise self-evident: even if Answer wanted to transfer the covenant without SRAM's written permission, Answer cannot do so unless it also transfers substantially all of its stock or relevant assets. *Id*.

With this in mind, this Court turns to consider whether the assignment clause—Section 8.5—of the Settlement Agreement was satisfied for each of the steps by which the Agreement ultimately passed to Hayes.

### 2. The Transfer from Answer to Guaranty

On November 2, 2006, Answer entered into an agreement to voluntarily surrender its collateral, including its bicycle suspension assets, to Guaranty. Voluntary Surrender Agreement at 1. Unlike the Settlement Agreement, the Voluntary Surrender Agreement is, by its terms, governed by California law. Voluntary Surrender Agreement§ M.15. The language of the Voluntary Surrender Agreement is, in all ways relevant to the question at hand, unambiguous, and neither Hayes nor

---

to authorize, as Hayes seems to argue, Answer to transfer some of its *rights* under the Settlement Agreement—such as its right to produce Royalty Products under the Agreement without fear of suit from SRAM—without also transferring its accompanying *obligations*—such as its obligation not to challenge the validity of the '049 Patent. Indeed, the rights under the agreement are conditioned on the corresponding *obligations*.

SRAM provides any facts that cast the Agreement in a different light. *Pac. Gas & Elec. Co.*, 442 P.2d at 644; *Brant*, 48 P.2d at 16; *Gardiner*, 329 P.2d at 27.

The Voluntary Surrender Agreement meets the three requirements of Section 8.5 and therefore effectuates a transfer of the Agreement's rights from Answer to Guaranty. First, Answer's *voluntary* surrender of its assets meets whatever agency requirement may be read into Section 8.5 of the Settlement Agreement. The Voluntary Surrender Agreement notes in several places that the assets are being surrendered voluntarily. *E.g.*, Voluntary Surrender Agreement § M.3(a), (b). The applicable California loan-default statute, California Commercial Code § 9609, permits the passing of assets either by judicial process, Cal. Com. Code § 9609(b)(1), or by the parties' own actions, Cal. Com. Code § 9609(b)(2). As the Voluntary Surrender Agreement unambiguously reflects, Answer transferred its assets to Guaranty voluntarily, under Cal. Com. Code § 9609(b)(2). Therefore, even if Answer must exercise some agency in transferring the Settlement Agreement, it did so here by electing to surrender its assets to Guaranty.[5]

On the second requirement for assignment under Section 8.5, Answer's voluntary surrender of the collateral in connection with its default constitutes a

---

[5] As will be discussed in greater detail later, there is no genuine ambiguity about what is being transferred from Answer to Guaranty: the Voluntary Surrender Agreement references the Asset Purchase Agreement, which provides a list of the assets transferred from Answer to Guaranty to HB, including, crucially, "general intangibles (including all patents, trademarks, trade secrets, and know-how and all rights to use of same, including, without limitation, rights granted by SRAM . . . )." Asset Purchase Agreement § 1.1. Thus, the Court concludes that there is no genuine dispute of material facts with respect to this issue: Answer has transferred the rights provided by the Settlement Agreement to Guaranty through the Voluntary Surrender Agreement.

"transfer or assign[ment]" made in connection with a "merger, sale or transfer" of its assets. Settlement Agreement § 8.5. Although these assets were passed in connection with Answer's loan default, the transfer still fits comfortably within the requirement that the assets be "transferred or assigned" in connection with a "merger, sale or transfer"; Answer's voluntary surrender of these assets pursuant to its contractual credit obligations is no less a transfer of the assets then the voluntary surrender of the assets pursuant to any other contractual obligation.

The third and final requirement for assignment is also met. The transfer in question involved all of Answer's stock and substantially all of its assets. Specifically, Recital M.3 of the Voluntary Surrender Agreement states that the collateral to be surrendered "shall include 100% of the issued and outstanding capital stock of Answer." Voluntary Surrender Agreement § M.3(a). Moreover, Recital J of the Voluntary Surrender Agreement states that "HB Bicycle Components, LLC (the 'Buyer') has agreed to purchase the assets of Answer through a private sale (the 'Private Sale') conducted by GBCC." Voluntary Surrender Agreement § J. Although the specific list of the assets surrendered from Answer to Guaranty and then sold to HB is redacted, revealing only that the rights associated with the patent in question—Patent '049—were transferred, the Secured Party Asset Purchase Agreement between Guaranty and HB nevertheless provides a sufficiently detailed and complete list of the assets transferred to HB. That list indicates that the assets include, at the very least, substantially all of Answer's assets related to its suspension-fork business. Asset Purchase Agreement § 1.1. For example, in addition to the rights

12

associated with the specific patent at issue, other assets listed in the Asset Agreement include the "Debtor's complete inventory of raw materials, supplies, work in process, finished goods and parts . . . used in or related to the Business," "[a]ll of the property which is or has been used by Debtor in . . .the Business," all dealer and customer lists and rights, "[a]ll customer contracts of Debtor which Purchaser elects to assume relating to the Business," and "[a]ll accounts" and accounts receivable held by the Debtor at the time of the surrender. Asset Purchase Agreement § 1.1(c), (d), (g), (j), (k).

To summarize, the Voluntary Surrender Agreement and the Asset Purchase Agreement show that Answer effectuated a transfer of all or substantially all of its stock and assets to Guaranty. Therefore, along with the rights provided by the Settlement Agreement—including the right to produce Royalty Products that infringe the '049 Patent without fear of suit—Guaranty assumed the Settlement Agreement's obligations.

### 3. The Transfer from Guaranty to HB

Immediately after the transfer of assets from Answer to Guaranty, Guaranty sold all of Answer's assets to HB. *See* Asset Purchase Agreement. Like the Voluntary Surrender Agreement, the Asset Purchase Agreement is governed by California law. Asset Purchase Agreement § 8.6. The language of the Asset Purchase Agreement is, in all ways relevant to the present motions, unambiguous, and neither Hayes nor SRAM provide any facts that cast the Agreement in a different light. *Pac. Gas & Elec. Co.*, 442 P.2d at 644; *Brant*, 48 P.2d at 16; *Gardiner*, 329 P.2d at 27 .

13

Like the Voluntary Surrender Agreement, the Asset Purchase Agreement meets the three requirements of Section 8.5 of the Settlement Agreement and therefore effectuates a transfer of Answer's rights under the Settlement Agreement from Guaranty to HB. Hayes's arguments to the contrary are rejected. First, Hayes contends that this sale did not fulfill the terms of the Settlement Agreement because "*Answer* [did not] transfer or assign its rights under this Agreement." R. 73, Def.'s Mot. Dismiss Br. at 8. According to Hayes, because Answer was not party to the Asset Purchase Agreement, and "because Guaranty Business did not succeed Answer for the purpose of conducting Answer's ongoing business operations"—"Guaranty Business merely collected the collateral pledged by Answer to collect some of the money Answer owed under the Credit Agreement"—the Settlement Agreement could not have been satisfied with respect to the Asset Purchase Agreement. *Id.* But Answer did not need to be a party to the Asset Purchase Agreement: as previously discussed, Answer had already assigned all of its rights (and obligations) associated with the Settlement Agreement to Guaranty through the Voluntary Surrender Agreement. Among the rights assigned to Guaranty is that provided by Section 8.5: the right to assign the license or covenant not to sue, as well as all other rights under the Agreement. Settlement Agreement § 8.5. Because Answer validly assigned its rights, Guaranty took on the power to exercise its newly-possessed right to assign the Settlement Agreement (and the Agreement's accompanying rights and obligations)—so long as, of course, the other conditions of Section 8.5 are met. The Settlement Agreement cannot reasonably be read to limit the assignment of the rights under the Agreement to one assignment, exclusively by

14

Answer and not an assignee. The section must instead be construed to mean that Answer, *or its assignee*, may transfer the license and covenant not to sue. Just look at the section of the Settlement Agreement immediately before Section 8.5: "Unless otherwise restricted herein, this Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns." Settlement Agreement § 8.4. Because Guaranty was properly Answer's assignee, and because Guaranty exercised its agency in selling Answer's assets to HB, the Asset Purchase Agreement satisfies the agency requirement of Section 8.5 ("Answer may . . . .").

The second assignment requirement is met: the transfer of Answer's assets from Guaranty to HB constitutes a "transfer" in connection with the "sale" of those assets. Settlement Agreement § 8.5. Indeed, Hayes does not dispute that the Asset Purchase Agreement transferred Answer's assets and that this transfer was made in connection with the sale of the assets.

The third assignment requirement is also satisfied: the transfer in question involves all of Answer's stock and substantially all of its assets related to bicycle suspensions. In fact, the Asset Purchase Agreement transferred the exact same assets as did the Voluntary Surrender Agreement. Indeed, the two agreements reference each other—they were executed simultaneously—and together the agreements effectuate a transfer from Answer to HB. *See* Asset Purchase Agreement; Voluntary Surrender Agreement.

Because the Asset Purchase Agreement constitutes a transfer of all of Answer's stock and substantially all of its relevant assets to HB pursuant to a sale, the Section 8.5 conditions were met, and the rights associated with the Settlement Agreement were validly assigned from Guaranty to HB.[6]

### 4. The Transfer from HB to Hayes

At the time that Guaranty transferred Answer's assets to HB, which was a limited liability company, Defendant Hayes was the sole member of HB. Pl.'s SOF ¶ 20. Several years later, on January 1, 2009, HB transferred all of its assets to Hayes and HB was liquidated. *Id.* ¶¶ 28-29.

The transfer from HB to Hayes also meets the requirements of Section 8.5 of the Settlement Agreement and therefore effectuates a transfer of the license and covenant not to sue from Guaranty to HB. As the valid assignee of Answer's rights, HB had the

---

[6]Hayes also asserts that "HB [Bicycle] acquired the option to pursue only the assets it elected to pursue," and that because it did not pursue the Settlement Agreement, it cannot be bound by its terms. Opp'n Mem. at 6. This argument finds no support in either the terms of the Asset Purchase Agreement or Hayes's own actions. First, the Asset Purchase Agreement does not say that it is an option contract rather than an ordinary sale. To the contrary, Article 1, Section 1.1 of the agreement, labeled "Purchase and Sale," notes that "*Seller* hereby *sells*, transfers and delivers to Purchaser *all* of the right, title and interest of Debtor." Asset Purchase Agreement § 1.1 (emphasis added). Even drawing all reasonable inferences in favor of Hayes, this Agreement cannot be construed to mean anything other than what it plainly states: that HB purchased all of Answer's assets. *Id.* Because Hayes has submitted no extrinsic evidence that casts this language in a different light, the Court reads the Asset Purchase Agreement to mean what it unambiguously says: that HB received from Guaranty all of Answer's relevant assets, including the Settlement Agreement. Second, even if the Court were to conclude that HB must affirmatively elect to assume the rights granted by SRAM to Answer, it appears that HB did exactly this by making a royalty payment to SRAM in 2007. Campbell Dep. 96:7-97:15. Contrary to Hayes's protestations, *see* Opp'n Mem. at 4, the fact that a later re-design of its suspension forks lessened the need for HB to make further payments to SRAM, does not mean that HB did not assume the Settlement Agreement. Hayes has introduced no evidence, and has made no argument, to show that its 2007 royalty payment was made for any other purpose. No reasonable jury could find otherwise.

right to transfer the Settlement Agreement. HB's transfer of its assets to Hayes constituted a "transfer" that HB voluntarily made. *Id.*; *see* Settlement Agreement § 8.5. And the transfer from HB to Hayes included all of HB's assets, which, in turn, included all of Answer's assets that had been possessed by Guaranty, Pl.'s SOF ¶¶ 28-29, including all of Answer's stock and substantially all of its assets. Therefore, HB's transfer of all of its assets to Hayes included 100% of the stock formerly belonging to Answer, as well as substantially all of the relevant assets formerly possessed by Answer. *Id.* HB's transfer of its assets to Hayes therefore met the Section 8.5 conditions, and validly assigned Answer's rights and obligations to Hayes.

### 5. The No-Challenge Provision in the Settlement Agreement

Having concluded that Answer's rights and obligations were validly assigned to Hayes, it is time to consider whether the Settlement Agreement prevents Hayes from challenging the validity of the '049 Patent. The unambiguous language of the Agreement dictates the answer: yes. Section 7.5 of the Settlement Agreement says:

> Assistance and Cooperation. Should SRAM be involved in litigation against a third-party with respect to the '049 Patent, Answer agrees to cooperate with SRAM in the prosecution of such action, but at no expense to Answer, and Answer shall not be entitled to any recovery, or portion thereof obtained as a result of such litigation. *Answer agrees not to take any action whatsoever to attack the validity or enforceability of any of the '049 Patent* or '697 Patent, or cooperate in any such attack by another party other than through compliance with a lawfully issued subpoena.

Settlement Agreement § 7.5 (emphasis added). Hayes thinks that the no-challenge provision applies only to suits where a third party is litigating against SRAM. Specifically, Hayes asserts that Section 7.5 "is limited to Answer's 'assistance and

17

cooperation' in the circumstances where 'SRAM [would] be involved in litigation against a third-party with respect to the '049 Patent.' . . . [I]t is not a broad prohibition that prevents Answer from challenging the validity of the '049 Patent under any other circumstances . . . ." Def.'s Mot. Dismiss Br. at 12-13. This is not, however, a reasonable interpretation of the Agreement's text. Notably, the provision states that "Answer agrees not to take any action whatsoever to attack the validity or enforceability of any of the '049 Patent or '697 Patent, *or* cooperate in any such attack by another party other than through compliance with a lawfully issued subpoena." Settlement Agreement § 7.5 (emphasis added). By separating the first half of the sentence—which unambiguously prohibits Answer from challenging the '049 Patent—from the second part of the sentence with the alternating coordinating conjunction "or," the Agreement divides the sentence into independent and separate parts: Answer may not attack the validity of the '049 Patent *and* Answer may not cooperate in an attack by another party against the '049 Patent. This language specifically, clearly, and unambiguously prohibits Answer and its assigns from challenging the '049 Patent under all circumstances. *See Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1364 (Fed. Cir. 2001); *see also Air Safety, Inc.*, 706 N.E.2d at 884. Because Hayes is bound by the terms of the Settlement Agreement, including the no-challenge provision, Hayes cannot challenge the validity of the '049 Patent, even as a defense to the present lawsuit. Settlement Agreement §§ 7.5, 8.5. That means that SRAM's motion for partial summary judgment is granted.

### B. Motion to Dismiss

In light of the grant of partial summary judgment in SRAM's favor, it should come as no surprise that Hayes's motion to dismiss is denied. SRAM's complaint set forth more than enough factual material, accepted as true, to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). And, as discussed above, the summary judgment briefing and factual record now have demonstrated that summary judgment on this issue—that Hayes is bound by the Settlement Agreement and cannot challenge the '049 Patent—must be entered in SRAM's favor.

ENTERED:

    s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 26, 2013